ROBERTS, C.J., Associate Judge.
 

 Lakeview Reserve Homeowners Association, Inc. (“the Association”) appeals from the final summary judgment entered in favor of Maronda Homes, Inc. and T.D. Thomson Construction Company (collectively “the Developer”)
 
 [1]
 
 . The sole issue for our review is whether a homeowners association has a claim for breach of the common law implied warranties of fitness and merchantability, also referred to as a
 
 *904
 
 warranty of habitability, against a builder/developer for defects in the roadways, drainage systems, retention ponds and underground pipes in a residential subdivision. We hold that it does and, accordingly, reverse.
 

 The Developer developed a residential subdivision in Orange County, Florida, and incorporated the Association to serve as the homeowners association of that subdivision. In developing the subdivision, the Developer performed certain site work, including construction of the stormwater drainage system and private roadways. During construction of the subdivision, the Developer retained control of and managed the subdivision. Ultimately, the Developer transferred all control of the subdivision to the individual lot owners and the Association.
 

 The Association filed a complaint against the Developer for breach of the implied warranties of fitness and merchantability based on latent defects in the subdivision’s common areas. Specifically, it claimed that the roadways, retention ponds, underground pipes, and drainage systems throughout the subdivision were defectively constructed. The Developer filed a motion for summary judgment, arguing that the common law implied warranties of fitness and merchantability do not extend to the construction and design of private roadways, drainage systems, retention ponds and underground pipes, or any other common areas in a subdivision, because these structures do not immediately support the residences. The trial court agreed and entered summary judgment against the Association.
 

 In entering summary judgment, the trial court relied upon
 
 Conklin v. Hurley,
 
 428 So.2d 654 (Fla.1983), and
 
 Port Sewall Harbor & Tennis Club Owners Association, Inc. v. First Federal Savings and Loan Association of Martin County,
 
 463 So.2d 530 (Fla. 4th DCA 1985). We review the trial court’s order
 
 de novo. Volusia County v. Aberdeen at Ormond Beach, L.P.,
 
 760 So.2d 126 (Fla.2000). The Developer urges us to likewise rely on
 
 Conklin
 
 and
 
 Port Sewall,
 
 and to uphold the trial court’s decision. We decline to do so, and, instead, hold that there is a common law warranty of habitability applicable in the case at bar. Although we are constrained by the holding in
 
 Conklin,
 
 it is our opinion that the facts of the instant case are distinguishable from the facts in
 
 Conklin.
 
 We, nevertheless, reach a different conclusion than our sister court in
 
 Port Sewall,
 
 which applied the holding in
 
 Conklin
 
 to a similar set of facts as presented here. We, therefore, certify conflict with the Fourth District Court of Appeal.
 

 A review of the history of the application of implied warranties for habitability is instructive. For centuries, caveat emptor, “let the buyer beware,” was generally the rule of law. This served well at a time when parties were thought to usually be on equal footing and neither had a significant advantage in discerning potential defects to goods sold in the marketplace. This theory was particularly persistent in land sales, where a buyer could, and wisely should, inspect the land to ensure it was suitable for the buyer’s intended use. The notion of caveat emptor initially carried over into the construction and sale of homes and commercial buildings. Buyers could still inspect the land, and early building construction and land development was relatively simple.
 

 As mass production of goods became more complicated and more common, courts began to impose liability on manufacturers and sellers, who were in a superi- or position to know of, or discover, defects than were the consumers.
 
 See, e.g., Manheim v. Ford Motor Co.,
 
 201 So.2d 440 (Fla.1967). Following this trend, courts
 
 *905
 
 have shown willingness to reject the notion of caveat emptor, and to impose liability on developers and sellers of realty. This movement away from caveat emptor is due in large part to today’s complex development climate. Permitting, site planning and site work, and construction of subdivisions and planned unit developments are significantly more complex than ever before, and a homebuyer is no longer on a level playing field with a builder/developer, as was once the case.
 

 In Florida, the first case to extend the implied warranties of fitness and merchantability to purchasers of new homes was
 
 Gable v. Silver,
 
 258 So.2d 11 (Fla. 4th DCA 1972) (hereinafter
 
 Gable I).
 
 There, the court quoted with approval the following language from Wells,
 
 Implied Warranties in the Sale of New Homes,
 
 28 U. Fla. L.Rev. 626 (1971):
 

 The question remains in Florida whether caveat emptor will be extended to foreclose implied warranties in the sale of new homes.
 

 It has been contended that adoption of the remedy of implied warranty would adversely affect the stability of the new house market. The use of implied warranties with the respect to the sale of new chattels, however, has not had the effect of destroying the stability of the market place for chattels, ... Moreover, under the theory of implied warranty the purchaser would always have the burden of proving the house was defective when sold and could only recover if he were the first occupant of a new house.
 

 Although the theory of implied warranty should not drastically affect the position of the legitimate builder-vendor, the doctrine could be very effective in reducing the number of those undesirables within the industry who have no intention of standing behind the quality of their work.... It should also be noted that the legitimate builder-vendor is much more capable of distributing the cost of his mistakes than is the innocent home buyer.
 

 Undoubtedly, the law regarding the liability of a builder-vendor of new houses is changing. The above cases indicate a growing trend away from caveat emptor and toward the theory of implied warranty. The movement brings the law much closer to the realities of the market for new homes than does the anachronistic maxim of caveat emptor. The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping its common law principles abreast of the times. Ancient distinctions which make no sense in today’s society and tend to discredit the law should be readily rejected.
 

 Gable I,
 
 258 So.2d at 17.
 

 The Fourth District noted that, at the time of its decision, the rule that implied warranties do not extend to realty was fast eroding, as fourteen other jurisdictions had already rejected the rule.
 
 [2]
 
 In extend
 
 *906
 
 ing the implied warranties to the sale of homes, most courts echoed sentiments similar to those expressed by the Arkansas Supreme Court in
 
 Wawak v. Stewart,
 
 247 Ark. 1093, 449 S.W.2d 922, 923 (1970), in which the court stated:
 

 Both the rapidity and the unanimity with which the courts have recently moved away from the harsh doctrine of caveat emptor in the sale of new houses are amazing,....
 

 ... The contrast between the rules of law applicable to the sale of personal property and those applicable to the sale of real property was so great as to be indefensible. One who bought a chattel as simple as a walking stick or a kitchen mop was entitled to get his money back if the article was not of merchantable quality. But the purchaser of a $50,000 home ordinarily had no remedy even if the foundation proved to be so defective that the structure collapsed into a heap of rubble.
 

 The Fourth District joined those jurisdictions applying implied warranties to the sale of new homes. It held that “the implied warranties of fitness and merchantability extend to the purchase of new homes and condominiums in Florida from builders.” 258 So.2d at 18. The Florida Supreme Court upheld the Fourth District ruling, and established it as the law in this state.
 
 Gable v. Silver,
 
 264 So.2d 418 (Fla.1972).
 

 A decade later, in
 
 Conklin,
 
 the case mainly relied upon by the Developer, the Florida Supreme Court discussed
 
 Gable I,
 
 and held that implied warranties of fitness and merchantability do not extend to first purchasers of residential real estate for improvements to land, other than the construction of a home and other improvements “immediately supporting the residence thereon, such as water wells and septic tanks.”
 
 Conklin,
 
 428 So.2d at 655. The facts of that case are important to an understanding of our reasoning in the instant case.
 

 In
 
 Conklin,
 
 purchasers of vacant lots sought to recover from the developer for defects in a seawall abutting and buttressing the lots. The purchasers appeared to have bought the lots primarily for the purpose of investment, with an eye toward resale to other investors or to homebuild-ers. At the time of purchase, the seawall was the only improvement to the land. Following heavy rains, the seawall collapsed, and the purchasers sued the developer on a theory of implied warranty.
 
 Id.
 
 at 656.
 

 
 *907
 
 After a very thorough review of the historical trend in the development of implied warranties, in derogation of caveat emptor, the
 
 Conklin
 
 court gleaned the kernel of the basis for imposition of liability under implied warranties. The court stated:
 

 The rationale of the cases which relax or abandon the doctrine of
 
 caveat emptor
 
 is that the purchaser is not in an equal bargaining position with the builder-vendor of a new dwelling, and the purchaser is forced to rely on the skill and knowledge of the builder-developer with respect to the materials and workmanship of an adequately constructed dwelling house.... Common threads running through all the decisions extending implied warranties to purchasers of new homes are the inability of the ordinarily prudent homebuyer to detect flaws in the construction of modern houses and the chattel-like quality of such mass-produced houses.
 

 Id.
 
 at 657-58. In considering the specific facts presented before it, however, the court found that such rationale was not applicable:
 

 [W]e fail to see how the policy upon which
 
 Gable
 
 and its kindred were based would be furthered by application here.... Purchasers of such relatively unimproved realty may more reasonably be expected to inspect the property knowledgeably before purchase and may more likely be able to bargain for an express warranty than those who buy as complex a structure as a modern home.
 

 Id.
 
 at 658. It is clear then that the court’s decision was based on the fact that the land and the seawall were subject to a competent inspection by the buyers, and that the buyers, as investors presumably on equal footing with the developer, were not in need of the consumer protection of implied warranties.
 

 This view of the
 
 Conklin
 
 majority’s decision is strengthened by a reading of Justice Adkins’ dissenting opinion. He acknowledged the same historical trends in the application of implied warranties. He stated the same need for protection of consumers who do not have the requisite knowledge and expertise, and are dependent on the expertise of the builder/developer of a complex structure.
 
 Id.
 
 at 659-60 (Adkins, J., dissenting). He reached an opposite conclusion, however, decrying the failure of the majority to include “investors” in policy concerns for consumer protection, and finding that a seawall is also a complex structure; one that is “beyond the buyer’s ability to inspect.”
 
 [3]
 

 Id.
 
 at 660-61.
 

 With this understanding of
 
 Conklin
 
 in mind, we distinguish it from the instant case. Here, the plaintiff seeking a remedy under the implied warranties is not an investor, as was the case in
 
 Conklin.
 
 Rather, it is a homeowners association, representing individual homebuyers who purchased the homes mainly for their own residential purposes. Thus, unlike the investors in
 
 Conklin,
 
 these homebuyers are clearly within the ambit of public policy extending consumer protection. Additionally, the defects in this case are distinguishable from the defect considered by the majority in
 
 Conklin.
 
 The structures here are, without dispute, complex site improvements, some of which are underground. These improvements were put in
 
 *908
 
 so that the builder/developer could market move-in ready homes in a completed subdivision. The planning, permitting, site work and construction required to build these improvements requires expertise far beyond the expertise of the average home-buyer, so that the homebuyer, as well as homeowners association, must rely on the expertise of the builder/developer. During the construction of these structures, it is the builder/developer that has the opportunity for periodic inspection and approval of the ongoing work, not the homebuyer or homeowners association. The builder/developer is in a superior position to ferret out and discover defects in the construction of the improvements and to have the defects timely cured during construction. Upon completion of the construction, the defects are not readily discernable to the average homebuyer, even with diligent inspection.
 

 Despite these factual distinctions, we acknowledge that we must also address the language in
 
 Conklin
 
 that extends the implied warranties only to improvements “immediately supporting the residence thereon, such as water wells and septic tanks.” In applying that language to the facts presented in this case, we reach a different conclusion than our sister court in
 
 Port Sewall.
 

 There, a homeowners association brought suit on behalf of the individual homeowners, based on breach of the implied warranties of fitness and merchantability, to recover for defects in the construction of certain roads and drainage areas in the community.
 
 Port Sewall,
 
 463 So.2d at 530. The trial court entered a directed verdict in favor of the defendant, based on
 
 Conklin,
 
 and the Fourth District affirmed, stating:
 

 The foot bridge in question and the defective work complained of involved roads and drainage in the subdivision .and did not pertain to the construction of homes or other improvements immediately supporting the residences. That is the extent of the application of implied warranties to first purchasers of residential real estate in Florida.
 

 Id.
 
 at 531.
 

 We disagree with the Fourth District’s conclusion that roads and drainage in a subdivision do not immediately support the residences. We find the phrase “immediately support the residence” is subject to two meanings. The most apparent meaning, which seems to be the one used by the Fourth District, is something that bears or holds up a structure, such as a footer, a foundation or a wall, or is attached to the house. But we do not read
 
 Conklin
 
 this narrowly, and instead find that the phrase also refers to essential services, such as the two specifically pointed out by the
 
 Conklin
 
 court itself, septic tanks and water wells. These obviously “support” the home by making it habitable, and so, fit for its intended purpose.
 

 In the case before us, we consider other services that we conclude are essential to the habitability of the residence: roads, drainage systems, retention ponds and underground pipes. Regarding the latter, it does not matter if these are storm sewer pipes, water pipes or sanitary sewer pipes. They are all essential services. It is well to distinguish these services from non-essential services or items; some examples that come to mind, and not intended as an exhaustive list, but only illustrative, are landscaping, sprinkler systems, recreational facilities or a security system. A defect in these may be ugly, inconvenient or uncomfortable, but do not render a home unfit for its intended purpose, i.e., habitability.
 

 Thus we announce a test that is elegant in its simplicity: in the absence of
 
 *909
 
 the service, is the home inhabitable, that is, is it an improvement providing a service essential to the habitability of the home? If it is, then the implied warranties apply. Stated another way, we expressly hold that implied warranties of fitness for a particular purpose, habitability, and merchantability apply to structures in common areas of a subdivision that immediately support the residence in the form of essential services. We, likewise, hold that the services at issue in this case are services essential to the habitability of the home for purposes of application of the implied warranties. We emphasize, however, that our holding is limited to the facts of this case in that the Association and/or the homeowners may bring the claim for these privately-owned structures.
 

 We believe this ruling is in keeping with Florida’s strong public policy of protecting consumers in a situation where they must rely on the expertise of the builder/developer for proper construction of these complex structures, where they are in an inferior position to inspect the work and to correct the defects in the construction phase and where the defects are not readily discernable to the average homeowner. We also believe this is an exercise in common sense. The builder/developer intends the improvements to be constructed free of defects, so the lots can be sold and homes constructed. The marketplace benefits because if the improvements are properly constructed, the homes are available not only for sale, but resale as well. Because the Fourth District reached a contrary conclusion in
 
 Port Sewall,
 
 we certify conflict with that opinion.
 

 We are not complete in our review, however, if we do not address some collateral issues, raised on appeal. We reject the Developer’s position that the Association cannot bring a claim for implied warranties for defects in the common elements, but rather that the individual homeowners must bring the claims and that such claims can only be for damage to their individual lots or homes. In reality, a homeowners association represents the individual homeowners, and any cost of repairs to the defects in the common elements will be passed on to the homeowners in the form of assessments, regardless of whether that individual homeowner has damage to his or her own property. To require each homeowner to maintain a separate suit for damages is contrary to public policy in that it contemplates a multiplicity of lawsuits for the same issues, something we do not countenance. Such a scenario is not in the best interest of plaintiffs or defendants, and seriously erodes judicial economy.
 

 Additionally, we reject the Developer’s argument that the
 
 Conklin
 
 court intended that the structures be physically attached to the house. The essence of the illustrations used by the court was services essential to supporting the residence in terms of habitability. Attachment was only incidental to providing the service. In a hyper-technical way, roadways, drainage systems and underground pipes abut or attach to residential lots and homes in a subdivision. But it would be illogical to provide a warranty to a home that is attached to an improvement, but not to another home that receives the service from the improvement, but does not physically touch it. The Developer urges a very strained and unreasonably limiting construction of
 
 Conklin.
 

 We also reject the Developer’s argument that extending the implied warranties is a matter for the legislature. In the absence of a legislative pronouncement, we are free to apply common law, and this is a case of application of common law warranties. In fact,
 
 Gable I
 
 applied common law warranties in a condominium case before
 
 *910
 
 the legislature first enacted warranties for condominiums in section 718.203, Florida Statutes (1976). For similar reasons, we reject the Association’s application of cases extending implied warranties to the common areas in condominiums as we find those cases inapplicable precisely because those cases are decided on statutory grounds, not available here.
 

 REVERSED and REMANDED. CONFLICT CERTIFIED.
 

 GRIFFIN and ORFINGER, JJ., concur.
 

 [1]
 

 . The Association initially filed suit against Maronda Homes, the developer of a residential subdivision. Maronda then filed a third-party complaint against T.D. Thomson which Maronda hired to construct the roadways and drainage systems. There is no need to distinguish between these two appellees for purposes of this appeal.
 

 [2]
 

 . By the time
 
 Conklin
 
 was decided a decade later, thirty-three jurisdictions had extended the implied warranties to realty.
 
 See Sims v. Lewis,
 
 374 So.2d 298 (Ala.1979);
 
 Columbia W. Corp.
 
 v.
 
 Vela,
 
 122 Ariz. 28, 592 P.2d 1294 (1979);
 
 Wawak v. Stewart,
 
 247 Ark. 1093, 449 S.W.2d 922 (1970);
 
 Pollard
 
 v.
 
 Saxe & Yolles Dev. Co.,
 
 12 Cal.3d 374, 115 Cal.Rptr. 648, 525 P.2d 88 (1974);
 
 Carpenter v. Donohoe,
 
 154 Colo. 78, 388 P.2d 399 (1964);
 
 Vernali v. Centretla,
 
 28 Conn.Supp. 476, 266 A.2d 200 (1970);
 
 Koval v. Peoples,
 
 431 A.2d 1284 (Del.Super.Ct.1981);
 
 Gable v. Silver,
 
 258 So.2d 11 (Fla. 4th DCA),
 
 cert. denied,
 
 264 So.2d 418 (Fla.1972);
 
 Bethlahmy v. Bechtel,
 
 91 Idaho 55, 415 P.2d 698 (1966);
 
 Petersen v. Hubschman Constr. Co.,
 
 76 Ill.2d 31, 27 Ill.Dec. 746, 389 N.E.2d 1154 (1979);
 
 Barnes v. Mac Brown & Co.,
 
 264 Ind. 227, 342 N.E.2d 619 (1976);
 
 McFeeters v. Renollet,
 
 210 Kan.
 
 *906
 
 158, 500 P.2d 47 (1972);
 
 Crawley v. Terhune,
 
 437 S.W.2d 743 (Ky.Ct.App.1969);
 
 Banville v. Huckins,
 
 407 A.2d 294 (Me.1979);
 
 Loch Hill Constr. Co. v. Fricke,
 
 284 Md. 708, 399 A.2d 883 (1979);
 
 Weeks v. Slavik Builders, Inc.,
 
 24 Mich.App. 621, 180 N.W.2d 503,
 
 aff'd,
 
 384 Mich. 257, 181 N.W.2d 271 (1970);
 
 Brown v. Elton Chalk, Inc.,
 
 358 So.2d 721 (Miss.1978);
 
 Smith v. Old Warson Dev. Co.,
 
 479 S.W.2d 795 (Mo.1972);
 
 Chandler v. Madsen,
 
 197 Mont. 234, 642 P.2d 1028 (1982);
 
 Norton v. Burleaud,
 
 115 N.H. 435, 342 A.2d 629 (1975);
 
 Schipper v. Levitt & Sons, Inc.,
 
 44 N.J. 70, 207 A.2d 314 (1965);
 
 DeRoche v. Dame,
 
 75 A.D.2d 384, 430 N.Y.S.2d 390 (N.Y.App.Div.),
 
 appeal dismissed,
 
 51 N.Y.2d 821, 433 N.Y.S.2d 427, 413 N.E.2d 366 (1980);
 
 Griffin v. Wheeler-Leonard & Co.,
 
 290 N.C. 185, 225 S.E.2d 557 (1976);
 
 Jeanguneat v. Jackie Hames Constr. Co.,
 
 576 P.2d 761 (Okla.1978);
 
 Yepsen
 
 v.
 
 Burgess,
 
 269 Or. 635, 525 P.2d 1019 (1974);
 
 Elderkin v. Gaster,
 
 447 Pa. 118, 288 A.2d 771 (1972);
 
 Sousa v. Albino,
 
 120 R.I. 461, 388 A.2d 804 (1978);
 
 Rutledge v. Dodenhoff,
 
 254 S.C. 407, 175 S.E.2d 792 (1970);
 
 Brown v. Fowler,
 
 279 N.W.2d 907 (S.D.1979);
 
 Humber v. Morton,
 
 426 S.W.2d 554 (Tex.1968); Rot
 
 hberg v. Olenik,
 
 128 Vt. 295, 262 A.2d 461 (1970);
 
 House v. Thornton,
 
 76 Wash.2d 428, 457 P.2d 199 (1969);
 
 Moxley v. Laramie Builders, Inc.,
 
 600 P.2d 733 (Wyo.1979). At least one additional state has approved of the doctrine in dicta.
 
 Ass'n of Apartment Owners of Park Towers v. Child,
 
 1 Haw.App. 130, 615 P.2d 756 (1980).
 

 [3]
 

 . Fairness requires that we recognize that Justice Adkins would not extend implied warranties to roadways.
 
 Conklin,
 
 428 So.2d at 661 (Adkins, J., dissenting). Given the passage of time and the complex nature of site work, and the essential nature of roads to ingress and egress, we respectfully disagree. We conclude instead that private roadways, constructed by the developer and turned over for maintenance to the homeowners association, are indeed related to the fitness and habitability of a home.