LEWIS, J.
This case is before the Court for review of the decision of the Fifth District Court of Appeal in Lakeview Reserve Homeowners v. Maronda Homes, Inc., 48 So.3d 902 (Fla. 5th DCA 2010). The district court certified that its decision is in express and direct conflict with the decision of the Fourth District Court of Appeal in Port Sewall Harbor & Tennis Club Owners Association, Inc. v. First Federal Savings & Loan Association of Martin County, 463 So.2d 530 (Fla. 4th DCA 1985). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. Today we address the available and applicable law that protects Florida families when faced with defective development and construction of Florida homes. We affirm the decision of the Fifth District and disapprove the prior decision of the Fourth District to the extent that it is inconsistent with this opinion.
Facts and Procedural History
This appeal arises from an action filed by Lakeview Reserve Homeowners Association (“Lakeview Reserve”) against Mar-onda Homes, Inc., (“Maronda Homes”) for breach of the implied warranties of fitness and merchantability, which are also at times referred to as the implied warranty of habitability in the residential construction context. T.D. Thomson Construction Company (“T.D. Thomson”) was joined as a party to this action when Maronda Homes filed a third-party complaint against T.D. Thomson for indemnification based on the alleged violations of the implied warranties by Maronda Homes. The trial court entered final summary judgment in favor of Maronda Homes and T.D. Thomson. On appeal, the Fifth District reversed that summary final judgment, remanded for further proceedings, and certified conflict to this Court. Maronda Homes and T.D. Thomson petitioned separately for review. We granted review on both petitions and consolidated the cases for our review.
Lakeview Reserve’s underlying cause of action arises from alleged defects in the development and construction of a residential subdivision that Maronda Homes developed in Orange County, Florida. Maronda Homes incorporated Lakeview Reserve to ultimately serve as the homeowners association of that subdivision. As part of the development of the subdivision, Maronda Homes and T.D. Thomson performed all infrastructure and site work that included construction of a storm-water drainage system and private roadways. During construction, Maronda Homes and T.D. Thomson retained control of and managed the subdivision site. T.D. Thomson performed the site development work connected to the damages claimed. Management control of the subdivision was ultimately transferred to Lakeview Reserve. The Declaration of Covenants, Conditions, and Restrictions running with the subdivision land requires that all residents in the subdivision join the homeowners association (Lakeview Reserve) and that the association be responsible for the repairs and replacement of common property, including retention ponds, roads, surface water management system, and drainage pipes.
After Lakeview Reserve assumed actual management control of the subdivision, residents reported water and drainage problems caused by the infrastructure of the subdivision. Residents reported that storm water failed to drain properly which *1262 flooded driveways and completely impeded normal use. Residents also reported the collapse of storm drain runoffs. The runoffs collapsed in the direction of the residential driveways, causing a depression that obstructed normal driveway use. Numerous residents also experienced standing stagnant water and flooding in their residential lawns that persisted for days after rain had ended. The flooding required the installation of additional under drains and retention walls. These drainage and flooding issues persisted in both the front and back of the homes. Soil erosion and land depressions had occurred connected to the water problems.
Residents reported leaking storm-water pipes that also caused soil erosion and depressions between residential properties, the buckling and splitting of pavement and asphalt in the subdivision, and, due to the faulty drainage issues, excessive flooding of retention ponds. The flooding of the retention ponds — which were intended to be dry beds but due to the flooding became wetlands — created not only child safety issues as the ponds were not fenced, but also produced the development of mosquito infestation and swampy conditions.
Lakeview Reserve hired an independent consulting engineer to inspect the subdivision, assess its structural and drainage problems, and provide a written report regarding the conditions surrounding the residential areas in the development. The . report found that water saturation defects damaged the subdivision’s roadways. Defective conditions caused shallow groundwater to produce a defective raveling and premature degradation of surface roads. A layer of clay that had been placed under the roadways as fill soil caused standing shallow groundwater resulting in defective drainage. Remediation of this clay condition required the installation of under drains. The expert engineer found abnormal washouts, as well as improperly wrapped pipes that caused distress around inlets within the roads. The engineer found that fifteen to twenty percent of the pipes in the subdivision required repair to correct the infrastructure development and construction defects.
The engineer also found soil erosion and defective runoff problems that had directly impacted thirty-six residential properties within the subdivision. There was also moderate to severe grade changes between homes that caused progressing mild to moderate erosion in the rear of the properties. Remediation for the progressing erosion required the installation of erosion control measures, such as application of riprap (i.e., a stabilizing foundation made of loose or broken stone) and the construction of concrete retention walls. The installation of retention walls was necessary on thirty-nine properties that had experienced moderately steep to extremely steep slopes due to grade changes caused by the progressing erosion. The purpose for the installation of the retention walls was to eliminate the ongoing progressive erosion and to prevent future erosion of soil from the residential properties of the development.
To correct the residential subdivision’s infrastructure defects, which directly impacted the homes and access to the homes, Lakeview Reserve filed an action against Maronda Homes. Lakeview Reserve alleged that Maronda Homes defectively designed and constructed the subdivision’s infrastructure, roadways, retention ponds, underground pipes, and drainage systems, breaching the implied warranties of fitness and merchantability for the residential home development and causing damage to the entire residential subdivision. Lake-view Reserve asserted that the defects were latent, as they were not readily discoverable by home purchasers who lacked *1263 specialized knowledge, and undiscoverable by homebuyers upon the exercise of reasonable diligence at the time of purchase. Lakeview Reserve also alleged that it sustained serious damages due to the defects because one of its obligations as the homeowner association was to correct and repair the subdivision’s structural defects which impacted the homes in the development.
Maronda Homes and T.D. Thomson subsequently moved for final summary judgment, contending that the common law implied warranties of fitness and merchantability do not extend to the construction and design of the infrastructure, private roadways, drainage systems, retention ponds, underground pipes, or any other common areas in a residential subdivision because those structures do not immediately support the residences. The trial court agreed and entered final summary judgment in favor of Maronda Homes and T.D. Thomson relying on Conklin v. Hurley, 428 So.2d 654 (Fla. 1983), and the Fourth District’s decision in Port Sewall. Lakeview Reserve appealed that judgment to the Fifth District. The Fifth District reversed the trial court’s summary final judgment, held that the common law warranty of habitability is applicable in this case, and certified conflict with Port Sewall.
Maronda Homes and T.D. Thomson thereafter petitioned this Court for discretionary review. We granted review on the basis of certified conflict jurisdiction, as provided for by article V, section 3(b)(4), of the Florida Constitution.
Caveat Emptor and Implied Warranties
For centuries, the doctrine of caveat emptor (“let the buyer beware”) was the applicable rule of law governing disputes arising from the sale of real property. See Conklin, 428 So.2d at 656. Under this ancient doctrine, in the absence of an express agreement to the contrary, the seller of real property was not liable or responsible to the buyer for a defective condition in the real property that existed at the time the seller transferred possession to the buyer. See Restatement (Second) of Torts § 352 cmt. a (1965). Essentially, a purchaser bought real property at his or her own risk. See Black’s Law Dictionary 252 (9th ed. 2009) (defining caveat emptor as a “doctrine holding that purchasers buy at their own risk”). More specifically, this doctrine required the buyer to make his own inspection of the premises before the seller transferred possession and relieved the seller of any liability for defective conditions that existed at the time of transfer. See Restatement (Second) of Torts at § 352 cmt. a. The doctrine of caveat emptor assigned no duty to the seller to communicate to a buyer the existence of latent defects in the real property unless the seller, by act or implication, represented that such a defect did not exist. See Black’s Law Dictionary at 252 (quoting William R. Anson, Principles of the Law of Contract 245 (Arthur L. Corbin ed., 3d Am. ed. 1919)).
The theory upon which the doctrine of caveat emptor was constructed was that the sale of real property was an “arm’s-length” transaction between a buyer and seller with each having equal means of knowledge concerning the real property. See Elderkin v. Gaster, 447 Pa. 118, 288 A.2d 771, 774-75 (1972). This afforded the buyer only those protections for which he or she specifically contracted. See id. The doctrine also served as a convenient rule that courts could employ to expeditiously resolve disputes that arose from the sale of real property in favor of sellers. See Conklin, 428 So.2d at 656.
Throughout the history of American jurisprudence courts have routinely recognized and enforced express warranties *1264 contracted for by the parties to an agreement. See Elizabeth N. v. Riverside Group, Inc., 585 So.2d 376, 878 (Fla. 1st DCA 1991). Although English courts have recognized and enforced implied warranties since the nineteenth century, American courts began to recede from the doctrine of absolute caveat emptor and employ the use of implied warranties upon the advent of the mass production of complicated goods. See id. at 378-79. With the nascence of such production, goods became more complicated and sellers more sophisticated which prompted courts to recognize and enforce greater responsibility on sellers for defective goods using the concept of implied warranties. See id.; see also Conklin, 428 So.2d at 656. Courts reasoned that fairness required recognition of implied warranties because sellers were now in a superior position over buyers with regard to knowledge of, or the ability to discover and prevent, defects. See Conklin, 428 So.2d at 656 (“In the middle of this century an increasing number of courts and legislatures began to recognize that modern mass-production and mass-marketing techniques had unbalanced the relative bargaining strengths of consumers and manufacturers of personalty.”). The superior position, vantage point, and expertise of a builder and seller were especially profound in the complex context of the development, sale, and construction of real property. See Gable v. Silver, 258 So.2d 11, 14-16 (Fla. 4th DCA), adopted, 264 So.2d 418 (Fla.1972). Additionally, our courts have come to understand that the purchase of real property for residential purposes constitutes the single largest economic investment a Florida citizen makes during a lifetime. See Conklin, 428 So.2d at 659. The home is the fondest dream and largest investment, both emotional and financial, for Florida families.
In Gable, this Court adopted the view of the lower court of appeal that had examined the applicability of implied warranties to real property. See 258 So.2d at 12. That case involved an action filed by the buyer ' of a newly built condominium against the builder-seller for a defective air conditioning system. See id. At that time, Florida, in accordance with the then-majority rule, did not recognize or apply implied warranties to real property transactions. See id. at 12, 14.
The Gable Court noted that the general rule of caveat emptor in new home purchases had been fast eroding and that many states had adopted the “modem rule” that applied implied warranties to sales of real property. See id. at 14. The Court considered that the “purchase of a home is not an everyday transaction for the average family, and in many instances is the most important transaction of a lifetime,” and that to “apply the rule of caveat emptor ... in favor of a builder who is daily engaged in the business of building and selling houses, is manifestly a denial of justice.” Id. at 15 (quoting Bethlahmy v. Bechtel, 91 Idaho 55, 415 P.2d 698, 710 (1966)). This Court concluded that application of caveat emptor to the purchase of a new home was anachronistic and not in congruence with modern home buying practices — as ordinary purchasers do not have the same position, skill, or vantage point as a builder with regard to defects in a newly built home, with a builder-seller also having a greater capability to address the costs of his or her mistakes. See id. at 15-17.
We noted in Gable that other states, to discourage unscrupulous, shoddy work by builder-sellers, had imposed an exception to the doctrine of caveat emptor and applied implied warranties to real estate transactions. See id. át 15. To provide the same protection to homebuyers in *1265 Florida, this Court in Gable held that the implied warranties of fitness and merchantability applied to the purchase of new homes and condominiums. See id. at 18. Thus, Florida has recognized and enforced the implied warranties in connection with the sale of new homes and condominiums for forty years.
A decade after the Gable decision, this Court addressed the parameters of the implied warranties of fitness and merchantability in Conklin. See Conklin, 428 So.2d at 655. There, we held that the warranties would not apply to protect investors in vacant real estate with regard to a seawall constructed on that vacant land, unless the seawall was part of or in connection with the construction of a home or in support of the residence. See id. In that case, investment purchasers of vacant lots sought recovery from a developer for breach of the implied warranties with regard to that seawall. See id. at 656. The action arose from alleged defects in a seawall adjacent to vacant real property that had collapsed after a heavy rain. See id. The purchasers alleged that the implied warranties applied, and the collapse of the seawall adjacent to their vacant real property was within the protection of those implied warranties described in Gable. See id.
This Court held that the implied warranties of fitness and merchantability did not apply under those facts. See id. at 658. The Court reasoned that the seawall was not part of a completed structure and that each lot was vacant with the seawall serving as the only improvement connected with the real property. See id. The Court noted that the investment purchasers of those unimproved vacant lots should reasonably be expected to be more knowledgeable, more capable of inspecting the property before purchase, and better able to bargain for an express warranty than the purchaser of a more complexly constructed home. See id.
The Court also considered that the purchasers in Conklin acquired the vacant lots, not dwellings, for investment purposes only and, therefore, application of the implied warranties provided in Gable could thwart the consumer-protection purpose of that decision. See id. at 659. More specifically, the Court opined that vacant land speculators simply do not need the protections that Gable affords home-buyers. See id. This Court reasoned that “[tjhose who regularly trade in the real estate market are apt to enjoy a much stronger bargaining position” than a home-buyer because they may chose to place their investment capital elsewhere. Id. A routine homebuyer shoulders this burden within his or her other career time constraints and, generally, the homebuyer has less knowledge of real estate than a regular investor in real property. See id. Homeowners may purchase only one or two homes in a lifetime while investors work with real estate on a regular basis. See id. The Court understood that the economic consequences of a defect in construction may affect a homebuyer more severely than an investor in raw land:
For most consumers a house is the largest investment of a lifetime, often tying up most of one’s savings and a large percentage of income. A serious defect in a home may render a family or individual financially destitute. The investor, on the other hand, risks financial setback, but not necessarily catastrophe if the land he purchases proves to be less fit for its intended purpose than expected.
Id. This Court ultimately crafted the parameters of the implied warranties to exclude the vacant-land facts involved in Conklin. See id.
*1266 Two years after Conklin, the Fourth District addressed a related but far different factual situation which involved overarching issues directed to the position of mortgage lenders under warranty law after foreclosure of a mortgage encumbering a subdivision of real property, an important factor not present in this case. In Port Sewall, 463 So.2d at 531, a decision of limited assistance here, an original developer had completed “the bulk” of subdivision improvements when First Federal foreclosed a mortgage on the property, had the development completed, and sold subdivision lots. A homeowners association, which came into existence in an unstated manner at an unstated time, filed an action against First Federal to recover for defects in undescribed “certain roads and drainage areas,” along with a bridge not further identified in the opinion. See id. The court there concluded that the “work complained of’ did not “pertain” to the construction of homes or other improvements immediately supporting the residences. See id. More importantly, however, the overarching issue was the position of this mortgage lender after foreclosure in the application of warranty law. See id. The facts demonstrated that the mortgage lender had absolutely nothing to do with the construction complained of and did not become liable for the defects and breaches committed by the original developer prior to foreclosure as a matter of law. See id. at 531-32. The court there held that the lender’s exposure was limited to (1) express representations made by the lender, (2) patent construction defects, and (3) breach of warranties resulting from defects in the project completed by the lender. See id. at 532. The limited application of Port Sewall to the present case is clear, but the existence and application of warranties was again clearly recognized.
Decision Below
Under somewhat different facts, the Fifth District below reached a different but similar conclusion to that of the Fourth District in Port Sewall with regard to the application of implied warranties of fitness and merchantability to defects in a subdivision. See Lakeview Reserve, 48 So.3d at 908. The district court analyzed Gable and Conklin and reasoned that the implied warranties have application to improvements to real property that not only support residences in a structural sense, but also apply to the improvements which provide “essential services ” for the habitability of the homes. See id. (emphasis added). The court below held that the term “essential services” must include items that obviously support the home and make it habitable, thereby serving the intended purpose of implied warranties. See id. In the view of the district court, services “essential to the habitability of the residence” include roads for ingress and egress, drainage systems to divert flooding, retention ponds to correct water flow damage, and underground pipes (whether they be storm water or sanitary sewer pipes) which are necessary for living accommodations. See id. Items to be excluded from the definition of essential services are those that provide mere convenience or aesthetic beauty, such as landscaping, sprinkler systems, recreational facilities, or a security system. See id.
The court below announced a simple test for courts to use when considering whether the implied warranties of fitness and merchantability apply:
[I]n the absence of the semce, is the home inhabitable, that is, is it an improvement providing a service essential to the habitability of the home ? If it is, then the implied warranties apply. Stated another way, we expressly hold that implied warranties of fitness for a *1267 particular purpose, habitability, and merchantability apply to structures in common areas of a subdivision that immediately support the residence in the form of essential services. We, likewise, hold that the services at issue in this case are services essential to the habitability of the home for purposes of application of the implied warranties. We emphasize, however, that our holding is limited to the facts of this case in that the Association and/or the homeowners may bring the claim for these privately-owned structures.
Id. at 908-09 (emphasis added). The court below postulated that its holding was consistent with Florida’s strong public policy to protect homebuyers because such buyers rely on the expertise of builder-developers for the proper construction of complex structures. See id. at 909. The court noted that such protections are needed because homebuyers are typically in an inferior position to inspect work during construction and, therefore, unable to readily discern and correct defects. See id. The court concluded that the analysis in the case is “an exercise in common sense,” as a home built free of defects benefits the marketplace by permitting easy sale and resale. Id.
The Fifth District rejected the developers’ argument that this Court in Conklin intended that implied warranties only extend to structures that are physically attached to a house. See id. The court concluded that it would be illogical to apply warranties to a home that is attached to an improvement, but not to another home that receives the same services but is not physically attached to the improvement. See id.
Secondly, the court rejected the notion that Lakeview Reserve, as a homeowners association, does not have standing to file a claim for breach of implied warranties because individual homeowners must individually file such claims. See id. The court concluded that a homeowners association represents the individual homeowners and inevitably passes any cost of repairing damaged structures to each individual homeowner. See id. The appellate court held that to require individual legal actions by each homeowner would seriously erode judicial economy. See id. Finally, the Fifth District rejected the contention that implied warranties are a matter purely and exclusively for the Legislature. See id. The court below concluded that in an absence of legislation on this subject, courts are required to apply the common law, including the implied warranties recognized under that law. See id.
Implied Warranties and the Decision Below
The law applicable in this case was analyzed and outlined by this Court forty years ago in Gable. The law has clearly recognized that the developer, builder, and seller of new residential real estate is in the best position to have knowledge of, discover, and prevent defects in connection with the design, development, and construction of residential real estate. This is particularly applicable where the residential real estate is within a mass development of many homes. The development of large areas of real estate having multiple homes contemplates the design and installation of everything from the complete grading to infrastructure, drainage, and other essential items that enable access to and from each lot and are part of the services necessary for the buildings constructed to be used as residential premises. Building and zoning requirements have been adopted to cover all aspects of the design, development, and construction of structures to be used for residential purposes. The failure to satisfy these requirements would prevent the safe and *1268 sanitary use of structures for residential purposes if not corrected, and this burden should not be transferred to innocent purchasers. Thus, we agree with the decision below and conclude that the law of implied warranties of fitness and merchantability apply to improvements that provide essential services to the habitability of a residence. Therefore, we approve the decision below and disapprove the Fourth District’s decision in Port Sewall to the extent that it is inconsistent with this opinion.
In this case, the trial court entered a final summary judgment in favor of Maronda Homes and T.D. Thomson. Summary judgment is proper only if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. See Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). We view the facts in a light most favorable to the non-moving party and conduct a de novo review of such a judgment. See id.; Moore v. Morris, 475 So.2d 666, 668 (Fla.1985). Although the facts developed at trial may produce conflicts, at this stage we must view the facts and all inferences in favor of the homeowners. We must determine whether the district court below erred when it held that the implied warranties of fitness and merchantability apply to the infrastructure, drainage systems, retention ponds, and underground pipes which may be located in the common areas of Lake-view Reserve’s residential subdivision, but directly impact the homes and provide services essential to the habitability of the residences. We are therefore reviewing a district court’s determination of Florida law. This a pure question of law also subject to de novo review. See Southern Baptist Hosp. of Fla. v. Welker, 908 So.2d 317, 319 (Fla.2005).
Initially, we conclude that Lake-view Reserve is not without legal standing to present a claim for breach of the implied warranties of fitness and merchantability, as a homeowners association has the legal right to institute an action on behalf of its members for matters that concern the members’ common interest. See § 720.303(1), Fla. Stat. (2011) (“After control of the association is obtained by members other than the developer, the association may institute, maintain, settle, or appeal actions ... on behalf of all members concerning matters of common interest to the members....”); see also Homeowner’s Ass’n of Overlook, Inc. v. Seabrooke Homeowners’ Ass’n, Inc., 62 So.3d 667, 670 (Fla. 2d DCA 2011). This includes improvements for which the association is responsible. See § 720.303(1).
The general test for whether a party has breached the implied warranties of fitness and merchantability “is whether the premises meet ordinary, normal standards reasonably to be expected of living quarters of comparable kind and quality.” Hesson v. Walmsley Constr. Co., 422 So.2d 943, 945 (Fla. 2d DCA 1982). More succinctly, a warranty is breached if the residence is rendered not reasonably fit for the ordinary or general purpose intended. See Putnam v. Roudebush, 352 So.2d 908, 910 (Fla. 2d DCA 1977).
The Florida Statutes require that the common law is applicable unless it is inconsistent with the Constitution and laws of the United States and the acts of the Legislature of this State. See Wester v. Rigdon, 110 So.2d 470, 472 (Fla. 1st DCA 1959) (recognizing that the common law is in effect in Florida except insofar as it is modified or superseded by statute (citing § 2.01, Fla. Stat. (1957))). Therefore, we address whether the common law warranties of fitness and merchantability are applicable in this case.
*1269 We have examined our decisions in Gable and Conklin, and considered the purpose and public policy which support the implied warranties of fitness and merchantability. We agree with the decision below that the warranties extend to the residential real estate development at issue in this case. We also approve the reasoning of the decision below and approve the objective, “essential services” standard the district court set forth to determine whether a defect in an improvement beyond the actual confines of a home impacts the habitability and residential use of the home. Habitability of a home is impacted by stagnant standing water and the erosion of soil upon which the home is constructed. One need not wait until floodwaters inundate the home or the erosion swallows the residential structure to find protection. Habitability is impacted if the real estate experiences abnormal flooding events or abnormal stagnant standing water. Restrictions on the use of, or ingress to or egress from, residential property impacts habitability, and all of these conditions may have some relationship to a defective infrastructure system. Removal of excess storm water through properly designed, developed, and constructed storm water drainage systems can be as essential to the residential use of a structure as are septic and sanitary drainage systems.
Forty years ago in Gable, this Court recognized the position of the ordinary home purchaser in the context of modern home construction-buying practices. This context involves complex design, development, and construction and a developer-builder-seller who, due to daily involvement in home development, is in a more knowledgeable and advantageous position than the buyer with regard to potential defects that impact residential use. This Court has recognized that residential warranties reward the legitimate, quality developers and deter shoddy work and poor craftsmanship by those seeking only quick profit at the expense of quality and at the expense of and loss to Florida citizens. Based on these considerations, the Court decided to step forward from the arcane doctrine of caveat emptor and apply implied warranties to the sale of homes. Homes are, most probably, the singularly most significant economic expenditure for Florida families.
By applying the implied warranties to the real estate in this case, we apply the policies advanced by the decisions in both Gable and Conklin. More specifically, the defects in the real estate at issue here are part of a fundamental and essential support system for a complex infrastructure designed, constructed, and installed by the developers as a precondition to build the residential units and to obtain a certificate of occupancy for residential use. Due to their intricate, complex, and inherent underground positioning, these defects are more readily discoverable by the developers and less likely to be discovered by a typical homebuyer. These types of systems are absolutely essential to support the residential use of the residential units in the community and, therefore, fall within the purview of the type of complex defects for which the implied warranties are intended to provide protection. As noted by the Fifth District in the decision below, “[p]ermitting, site planning and site work, and construction of subdivisions and planned unit developments are significantly more complex than ever before, and a homebuyer is no longer on a level playing field with a builder/developer, as was once the case.” Lakeview Reserve, 48 So.3d at 905.
Furthermore, the improvements involved here, although they may not be physically attached to the homes, are structures that provide essential services *1270 regarding the habitability of the home and, as such, immediately support the residences. A defective drainage system that does not fulfill its intended purpose of dispersing water from the residential lots produces flooded driveways and soil erosion which impact their intended residential use. Collapse of storm drain runoffs also cause depressions in the road and residential driveways, obstructing ingress and egress. The use of private driveways is essential to the habitability of a home, as modern homebuyers use that location to park a primary means of transport and without which building permits and certificates of occupancy can be denied. The flooding caused by a defective drainage system that leaves stagnant standing water in the front and back yards of the homes affects the habitability of the homes by impeding a homeowner’s ability to enter, exit, or use his or her home and adjacent yard. These types of defects are reflected in expert reports in this record which we cannot disregard.
Moreover, leaking storm water pipes which cause depressions between properties and the buckling and splitting of pavement and asphalt in roadways may fall into the warranty protections. Conditions which impede the essential service of safe ingress and egress from the residences find warranty protections. Any structural defects in the subdivision which affect habitability by causing runoff and erosion around the homes are protected. Erosion undoubtedly obstructs the habitability of the home, as the eroding of the land around a residential lot destroys the intended use of a home as a safe and stable form of basic shelter. Lastly, the record here reveals inadequate drainage which has caused the flooding of retention ponds, has negatively impacted the habitability of the homes by ci-eating child safety issues, and has caused mosquito infestation and other dangerous conditions.
Even though the infrastructure improvements in this subdivision may not be physically attached to the homes, many component parts provide essential services that directly affect the habitability of the homes, and we conclude that such improvements provide immediate support to the residences. Thus, the implied warranties of fitness and merchantability extend to the defects alleged in this case.
In accordance with our analysis, we adopt the essential services test articulated in the decision below. That test also fits squarely within the Florida requirement that the implied warranties apply to improvements that are “immediately supporting” a residence. As exemplified in this case, an improvement that provides essential services that affects the habitability of a residence logically provides immediate support to that residence. To hold otherwise is to ignore the immediate effect on habitability that defects in certain infrastructure items have on a residence. Without things such as effective drainage systems and workable underground sewer pipes, habitability in a residence would be untenable. As provided in the decision below, such “essential services” do not include items that provide mere convenience or aesthetic beauty, such as landscaping, sprinkler systems, recreational facilities, or other similar improvements.
Legislative Developments
During the pendency of this case, the Florida Legislature enacted section 553.835, Florida Statutes (2012). The session law which enacted section 553.835 provides that it applies retroactively, stating that it “shall take effect on July 1, 2012, and applies to all cases accruing before, pending on, or filed after that date.” Ch.2012-161, § 3, Laws of Florida. As provided in the preamble to the session *1271 law, the purpose of section 553.835 is to abrogate the decision below, and consequently any prospective decision of this Court:
WHEREAS, the Legislature recognizes and agrees with the limitations on the applicability of the doctrine or theory of implied warranty of fitness and merchantability or habitability for a new home as established in the seminal cases of Gable v. Silver, 258 So.2d 11 (Fla. 4th DCA 1972) adopted and cert. dism., 264 So.2d 418 (Fla.1972); Conklin v. Hurley, 428 So.2d 654 (Fla.1983); and Port Sewall Harbor & Tennis Club Owners Ass’n v. First Fed. S. & L. Ass’n, 463 So.2d 530 (Fla. 4th DCA 1985), and does not wish to expand any prospective rights, responsibilities, or liabilities resulting from these decisions, and
WHEREAS, the recent decision by the Fifth District Court of Appeal rendered in October of 2010, in Lakeview Reserve Homeowners et al. v. Maronda Homes, Inc., et al., 48 So.3d 902 (Fla. 5th DCA, 2010), expands the doctrine or theory of implied warranty of fitness and merchantability or habitability for a new home to the construction of roads, drainage systems, retention ponds, and underground pipes, which the court described as essential services, supporting a new home, and
WHEREAS, the Legislature finds, as a matter of public policy, that the Mor-onda case goes beyond the fundamental protections that are necessary for a purchaser of a new home and that form the basis for imposing an implied warranty of fitness and merchantability or habitability for a new home and creates uncertainty in the state’s fragile real estate and construction industry, and
WHEREAS, it is the intent of the Legislature to reject the decision by the Fifth District Court of Appeal in the Moronda case insofar as it expands the doctrine or theory of implied warranty and fitness and merchantability or habitability for a new home to include essential services as defined by the court,
NOW THEREFORE,
Be It Enacted by the Legislature of the State of Florida
Ch.2012-161, pmbl., Laws of Fla.
The plain language of section 553.835(1) states that the intent of the law is to clarify the scope of the implied warranties because courts have reached different conclusions regarding their scope, which has created “uncertainty in the state’s fragile real estate and construction industry.” Section 553.835(2) also provides that it is the “the intent of the Legislature to affirm the limitations” to the implied warranties.
Section 553.835(4) provides the limitations for a cause of action for breach of the implied warranties: “There is no cause of action in law or equity to a purchaser of a home or to a homeowners association based upon the doctrine or theory of implied warranty of fitness and merchantability or habitability for damages to offsite improvements.” (Emphasis added.) Section 553.835(3) defines “offsite improvements” as:
(a) The street, road, driveway, sidewalk, drainage, utilities, or any other improvement or structure that is not located on or under the lot on which a new home is constructed, excluding such improvements that are shared by and part of the overall structure of two or more separately owned homes that are adjoined or attached whereby such improvements affect the fitness and merchantability or habitability of one or more of the other adjoining structures; and
(b) The street, road, driveway, sidewalk, drainage, utilities, or any other improvement or structure that is located *1272 on or under the lot but that does not immediately and directly support the fitness and merchantability or habitability of the home itself.
§ 553.835(3)(a)-(b), Fla. Stat. (emphasis added). Thus, under section 553.835, for an individual to have a cause of action for breach of the implied warranties, he must establish that (1) the claim is regarding a new home, (2) the claim is with regard to damage to the home or a structure or improvement on or under the home’s lot, and (3) the complained of improvement or structure immediately and directly supports the habitability of the home. See § 553.835(3)-(4).
Section 553.835(4) further states that it does not alter or limit a homeowner’s right to pursue any other cause of action arising from defects in “offsite improvements” originating in contract, tort, or by statute. See § 553.835(4). Lastly, the session law that created section 553.835 included a sev-erability clause:
If any provision of the act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.
Ch.2012-161, § 2, Laws of Fla.
Vested Rights
Article I, section 2, of the Florida Constitution guarantees to all persons the right to acquire, possess, and protect property. See American Optical Corp. v. Spiewak, 73 So.3d 120, 125 (Fla.2011). Section 9 of article I provides that “[n]o person shall be deprived of life, liberty or property without due process of law.” Art. I, § 9, Fla. Const. These constitutional due process rights protect individuals from the retroactive application of a substantive law that adversely affects or destroys a vested right; imposes or creates a new obligation or duty in connection with a previous transaction or consideration; or imposes new penalties. See Metro. Dade Cnty. v. Chase Fed. Hous. Corp., 737 So.2d 494, 503 (Fla.1999); State Farm Mut. Aut. Ins. Co. v. Laforet, 658 So.2d 55, 61 (Fla.1995). For the retroactive application of a law to be constitutionally permissible, the Legislature must express a clear intent that the law apply retroactively, and the law must be procedural or remedial in nature. See Chase Fed., 737 So.2d at 499.
Remedial statutes operate to further a remedy or confirm rights that already exist, and a procedural law provides the means and methods for the application and enforcement of existing duties and rights. See Alamo Rent-A-Car, Inc. v. Mancusi, 632 So.2d 1352, 1358 (Fla. 1994); City of Lakeland v. Catinella, 129 So.2d 133, 136 (Fla.1961). In contrast, a substantive law prescribes legal duties and rights and, once those rights and duties are vested, due process prevents the Legislature from retroactively abolishing or curtailing them. See Chase Federal, 737 So.2d at 503; Mancusi 632 So.2d at 1358 (“[SJubstantive law prescribes duties and rights.... ”).
Generally, once a cause of action accrues, it becomes a vested right. See Spiewak, 73 So.3d at 125-26. This is in accordance with United States Supreme Court precedent which holds that a cause of action is “a species of property protected by the Fourteenth Amendment’s Due Process Clause.” Logan v. Zimmerman Brush Co., 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). It is also consistent with this Court’s precedent which holds that after a cause of action accrues, it transforms into a protected property interest and becomes a vested *1273 right. See Wiley v. Roof, 641 So.2d 66, 68 (Fla.1994) (“Once the defense of the statute of limitations has accrued, it is protected as a property interest just as the plaintiffs right to commence an action is a valid and protected property interest.”). Therefore, after it has accrued, a cause of action is a vested right that may not be eliminated or curtailed. See, e.g., Spiewak, 73 So.3d at 125-30. A cause of action in tort accrues when the complaining party sustains damage and the last act necessary to establish liability occurs. See id. at 126.
For example, in Spiewak, the Court considered whether the appellees had a vested right in a common law cause of action based on personal injuries caused by asbestos, and whether the retroactive application of a statute to such an action was constitutionally permissible. See id. at 126,130. In that case, the Legislature had enacted a law (“the Act”) with the intended purpose of altering the common law elements for an action arising from asbestos — related diseáse including levels of injury as a condition precedent. See id. at 130. The Act attempted to make the accrual of an action for asbestos-caused disease contingent upon a party establishing a particular level of actual physical injury caused by the asbestos — a requirement that was not an element of the common law, which required only an injury caused by asbestos. See id. This Court concluded that individuals with a cause of action which accrued under the common law before the enactment of the Act had a vested interest in that action. See id.
Next, the Court considered whether the Act could be applied retroactively to causes of action for injuries caused by asbestos that accrued under the common law before the Act became effective. See id. The express language in the session law creating the Act provided that the Legislature intended that the Act apply retroactively. See id. at 131. Although the session law creating the Act announced that its provisions were remedial in nature and did not affect vested rights, this Court held that the Act was not remedial in nature given its imposition of a new element in a cause of action for personal injuries caused by asbestos that did not previously exist at common law — i.e., the showing of a particular level of physical injury. See id. The Court concluded that this requirement did not merely impair the vested rights of those with personal injury actions under the common law; it abolished them. See id. This Court accordingly held that the Act was substantive in nature and could not be applied retroactively to those with a vested right in an accrued cause of action under the common law. See id. at 133.
Lakeview Reserve’s Cause of Action
Contrary to the view of the dissent, the application and validity of section 553.835 have been placed at issue by the parties and have been fully briefed. In a supplemental filing, Maronda Homes and T.D. Thomson contend that the newly adopted section 553.835 applies retroactively and divests Lakeview Reserve of its cause of action for breach of the implied warranties. They allege that section 553.835 now abolishes Lakeview Reserve’s cause of action because it was based on defects in improvements not on or under the home’s lot. See § 553.835(3)-(4). They also allege that the Legislature intended for section 553.835 to apply retroactively to Lakeview Reserve’s cause of action because such retroactive application is expressly provided for in the session law. See Ch.2012-161, § 3, Laws of Florida (“This act shall take effect July 1, 2012, and applies to all cases accruing before, pending on, or filed after that date.”). T.D. Thomson contends that section 553.835’s retroactive application is permissible because it is remedial in na *1274 ture and does not create new obligations or duties, but rather provides the remedy of clarification of an existing right, i.e., that the implied warranties never applied to offsite improvements. Both T.D. Thomson and Maronda Homes contend that, even if section 553.835 is substantive, it permissibly applies retroactively because it does not affect a vested right. They contend that Lakeview Reserve’s cause of action does not involve a vested right because, at the time the action accrued, the implied warranties did not extend to improvements not on or under a home’s lot. They contend that the extension of the implied warranties was created by the Fifth District in its decision below, and therefore, did not exist at the time Lake-view Reserve’s common law cause of action accrued, thereby eliminating that action’s status as a vested right.
Here, Lakeview Reserve is correct in its contention that section 553.835 is substantive and not remedial in nature because it does not simply clarify an existing right, but rather, prescribes legal duties and rights. Section 553.835 cannot be constitutionally applied retroactively to Lakeview Reserve’s cause of action because that action is a vested right. Similar to the legislation in Spiewak, which attempted to limit legal rights in an action for injuries caused by asbestos by limiting such an action to individuals who could establish a particular level of personal injury, section 553.835 attempts to limit an individual’s legal rights under an action for breach of the implied warranties by limiting such an action to only improvements specifically on or under a particular new home’s lot that immediately and directly support the habitability of the home even if the defects specifically impact the habitability of the home. Therefore, as this Court held with regard to the statute in Spiewak, section 553.835 is substantive and not remedial in nature.
Next, we agree with Lakeview Reserve that it has a vested right in its cause of action for breach of the implied warranties as they existed under the common law because the common law controlled that action at the time it accrued. The action accrued at common law prior to the subject statute because that was when the defective improvements rendered the subject homes unfit for their intended purpose of habitability, thereby satisfying the elements of a claim for breach of the implied warranties. See Hesson, 422 So.2d at 945 (stating that the test for breach of the implied warranties “is whether the premises meet ordinary, normal standards reasonably to be expected of living quarters of comparable kind and quality”). At that time, the common law defined and dictated the scope of the implied warranties with regard to Lakeview Reserve’s cause of action. See § 2.01, Fla. Stat. (2012) (stating that the common law is in force in Florida to the extent it is “not inconsistent with the Constitution and the laws of the United States and the acts of the Legislature of this state”). Therefore, Lakeview Reserve has a vested right in its cause of action for the breach of the implied warranties as they existed under the common law.
Lastly, we agree with Lakeview Reserve that section 553.835 cannot be applied retroactively because that application would abolish Lakeview Reserve’s vested right in its common law cause of action for breach of the implied warranties. The ruling of the Fifth District in the case below is simply a decision with regard to the common law scope of the implied warranties. More specifically, we interpret the common law definition of improvements “immediately supporting” a residence — as it is used in a common law action for breach of the implied warranties — to include improvements that adversely impact a new *1275 home’s lot or physical structure that provide the home with “essential services” directly affecting habitability, such as drainage or underground sewage pipes.
The retroactive application of section 553.835 would offend due process because, as was the case in Spiewak, the retroactive application of the statute would abolish actions that have accrued under the common law. A retroactive application of section 553.835 would abolish Lakeview Reserve’s common law action by curtailing the scope of the action to improvements on or under a new home’s lot that immediately and directly support the habitability of the home, even if the defects directly impact the habitability of the home. This may eliminate part of Lakeview Reserve’s common law action because at least part of that action seeks relief for improvements that directly and adversely impact a home’s lot that provide the home with “essential services” directly affecting the home’s habitability. Therefore, we conclude that section 553.835 cannot apply retroactively because such application would offend due process by abolishing Lakeview Reserve’s vested right in its common law cause of action.
In addition, Maronda Homes alleges that, regardless of whether section 553.835 applies retroactively, this Court should not apply implied warranties beyond what the statute prescribes because it is the province of the Legislature to balance public policy and define the scope of the implied warranties. It is, however, the province of this Court and not the Legislature to decide issues of constitutional validity when a statute attempts to retroactively abolish common law remedies or the elements of such actions. See Jews for Jesus, Inc. v. Rapp, 997 So.2d 1098, 1103-04 (Fla.2008).
Article I, section 21, of the Florida Constitution declares the right to access the courts, stating that “The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay.” In Kluger v. White, 281 So.2d 1, 3-4 (Fla.1973), this Court interpreted the meaning of the phrase “redress of any injury.” It held that where a cause of action exists under the statutory or common law of Florida, the Florida Legislature may not abolish that action unless it provides a reasonable alternative for redress of injuries, or demonstrates an overpowering public necessity for its abrogation and no other means by which to meet that necessity. See id. at 4.
Here, Lakeview Reserve contends that section 553.835 violates article I, section 21, because it abolishes the cause of action for breach of the implied warranties and fails to provide a reasonable alternative or demonstrate an overpowering public necessity for that abrogation. Maronda Homes and T.D. Thomson allege that although section 553.835 curtails the cause of action for breach of the implied warranties, it preserves other viable remedies that may exist in tort, contract, or by statute, such as negligence, misrepresentation, and rescission.
Section 553.835 violates the right of access to courts because it attempts to abolish the common law cause of action for breach of the implied warranties for certain injuries to property. In section 553.835(4), the Legislature establishes its intent to abolish some implied warranties by expressly limiting a cause of action for their breach by eliminating “offsite improvements” from that action’s scope, even if such improvements impact the on-site habitability of the home. See 553.835(4), Fla. Stat. That statutory subsection abolishes a cause of action for breach of the implied warranties for “off-site improvements,” which are defined to include any improvement or structure that is not locat *1276 ed on or under a new home’s lot, and any improvement or structure that does not immediately and directly support the home’s habitability. See § 553.835(3), Fla. Stat. This limitation would apply even if those defects directly produce damage on a homeowner’s land and breach the implied warranties on the homeowner’s land. The statute even provides that the purpose of the law is to place limitations on the applicability of the doctrine or theory of implied warranty of fitness and merchantability, and to reject the decision by the Fifth District Court of Appeal in the Mar-onda case. This is a clear violation of separation of powers because the Legislature does not sit as a supervising appellate court over our district courts of appeal. See Bush v. Schiavo, 885 So.2d 321, 329-30 (Fla.2004).
Conclusion
We agree with the decision below and hold that the implied warranties of fitness and merchantability apply to the improvements that provide essential services to the Lakeview Reserve Homeowners Association. We remand this case to the trial court for further proceedings and factual determinations as may be required, all to be pursuant to and in accordance with this opinion. Further, section 553.835 does not apply to any causes of action that accrued before the effective date of this section. Therefore, we approve the decision below and disapprove the Fourth District’s decision in Port Sewall to the extent that it is inconsistent with this opinion.
No rehearing will be entertained by this Court.
It is so ordered.
PARIENTE, QUINCE, LABARGÁ, and PERRY concur.
POLSTON, C.J., concurs in part and dissents in part with an opinion.
CANADY, J., dissents with an opinion.