# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

No. 1D17-1941

———————————————

D.R. HORTON, INC. -
JACKSONVILLE,

    Appellant,

    v.

HERON'S LANDING
CONDOMINIUM ASSOCIATION OF
JACKSONVILLE, INC.,

    Appellee.

———————————————

On appeal from the Circuit Court for Duval County.
James Daniel, Judge.

December 27, 2018

LEWIS, J.

Appellant, D.R. Horton, Inc. – Jacksonville, appeals a final judgment entered in favor of Appellee, Heron's Landing Condominium Association of Jacksonville, Inc., and raises six issues, only two of which merit discussion.  Appellant contends that the trial court erroneously admitted extrapolation evidence and erred in failing to grant its motion for a directed verdict because Appellee sustained no actual damages as a result of alleged building code violations, failed to present evidence that Appellant knew or should have known of building code violations, and failed to establish a breach of the implied warranty of

habitability. For the following reasons, we reject Appellant's arguments and affirm.

FACTUAL AND PROCEDURAL HISTORY

In June 2013, Appellee filed a Complaint against Appellant, the developer and general contractor of Heron's Landing, the condominium project at issue. The project consisted of 240 residential units in twenty buildings. In its Amended Complaint, Appellee alleged that Appellant violated the Florida Building Code, breached warranties, and was negligent in its construction of the project.

Thereafter, Appellant filed a motion in limine wherein it sought to preclude the testimony of Appellee's experts W. Ron Woods and Bryan Busse related to defect allegations or repair recommendations on the grounds that the testimony was inherently unreliable and based on improper extrapolation. Appellant filed a second motion in limine relating to testimony presented by Woods and Busse wherein it requested that the trial court preclude both witnesses from testifying as to "opinions, observations, conclusions, damages, or otherwise related to alleged defects related to windows and sliding glass doors, stucco, or asphalt on the grounds that such opinions are without proper foundation, based upon extrapolation, and on the grounds that the testimony does not pass the threshold for admissibility required by Florida Statute Section 90.702."

During the hearing on the motions in limine, Mr. Woods testified that he had been involved in engineering consulting for almost forty years and had done "hundreds of building condition assessments and building condition surveys over the years." Woods, who was a member of certain committees in ASTM, the American Society for Testing and Materials, testified that ASTM E2018 is the standard for a property condition assessment and is used as a guideline "for the phase one of our forensic investigations or of the initial part of our forensic investigation because this is a nonintrusive, nondestructive approach to making observations on a building." All the ASTM standards were peer reviewed by professional engineers, architects, and building design professionals. According to Woods, who was the "principal author" of a textbook used in fifty colleges and universities across the

2

United States and Canada, the standards published by ASTM represented a consensus of the relevant scientific community. After testifying in detail about the problems he found at Heron's Landing, Woods was asked whether it was just his opinion that one should employ a qualitative sampling method, as opposed to a quantitative sampling method, or whether there had been any peer-reviewed publications to support his position. He replied, "Well, E2128 is a peer-reviewed publication. There is a peer-reviewed ASTM journal article that has to do with using these protocols for qualitative assessment." Woods testified that he had Tom Miller, a professional engineer, peer review his report.[1]

When later asked by the trial court what he was recommending with respect to all of the windows at the project, Woods replied, "In our remediation plan, all of the windows would be removed and the contractor's option, they can reuse those same windows provided they remediate them back to the manufacturer's requirements and they can put them back." The primary reason

---

[1] Miller explained in detail the methods and techniques that should be employed in the forensic investigation of wood frame stucco clad buildings by competent professional engineers. He also listed several techniques that are applied by the community of professional engineers in Florida to evaluate buildings similar to Heron's Landing. Miller stated, "Based on my review of the documents described above, [Appellee's experts] used the above methodologies in [their] forensic investigation of Heron's Landing in order to reach the opinions expressed in the reports . . . or stated in the deposition testimony given by Mr. Woods and Mr. Busse." Miller opined that the techniques used by the experts were techniques that are generally accepted in the community of Florida and national professional engineers when investigating building conditions at projects similar to Heron's Landing and were consistent with the intent of the peer-reviewed techniques published by the ASTM. He further opined that the methodology used was sufficiently reliable and had widespread acceptance within the relevant scientific community.

for removing the windows was to "flash properly around the windows." When asked by the trial court whether he was saying that all 220,000 square feet of stucco needed to be replaced based upon "200 something feet of testing," Woods replied, "That is accurate. . . ." When asked what criteria, other than testing, led him to that conclusion, Woods replied, "A lot of visual observation, a lot of indications of problematic conditions with the stucco that we have seen many times on other projects that have led to a need to remove those and the unpredictability of where water actually comes in." Mr. Busse similarly testified about the defects he found at the project and his method of testing and observation.

After hearing the parties' arguments, the trial court, in analyzing the issue pursuant to section 90.702, Florida Statutes (2013), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), found that the methodology used by Appellee's experts was scientifically reliable, had been peer-reviewed, had been developed by people in the industry, and was generally accepted in the scientific community. The trial court also referenced a Haughton and Murphy article stating that the "protocol" used by the experts had been "peer reviewed extensively and developed by people in . . . this area . . . ." In its written order, the trial court again found that both experts' testimony and opinions were based upon a recognized, peer-reviewed, and generally accepted methodology. The trial court also found that the "literature" rejected Appellant's argument that quantitative or statistically valid sampling was necessary to appropriately analyze the cause of moisture intrusion into a building envelope, what might prevent it, and the potential for moisture-related damage.

During trial, Appellee called several condominium unit owners, who testified about various issues they had experienced with their units, including, but not limited to, wet carpets and drywall, mold, wall cracking, roof leaks, and increasing noise coming through the walls from nearby units. Mr. Woods provided testimony similar to that provided during the hearing on Appellant's motions in limine, as well as additional testimony concerning the issues he found at the project. He also testified that the "defects in the buildings were the result of construction activities, and those construction activities happened when the

4

construction happened." Woods found the biggest issue to be the "stucco walls." He explained in detail how the stucco at issue did not meet the pertinent standards and the Florida Building Code. Woods opined that the issues he found would have been observable during construction. He testified that Appellant had one superintendent "on the job" throughout the course of construction. When asked why that was relevant, he replied, "Because he would have had the opportunity to correct these defects as they were observed, and he is the one who controls the job site and controls the activities of construction on the job site." Woods affirmatively responded when asked if he found things at the project indicating that changes were made during construction that were not in compliance with the plans drawn by the architect. He testified that homeowners could not deal with "voids" relating to the stucco. When asked what was required to fix the stucco, Woods replied, "Again, removal of the stucco and appropriate placement of the sealant profile in those areas." When asked if there was a way to stop stucco corrosion, Woods replied, "It gets faster with more moisture. . . . But there is no way to stop it once it has started without replacing it." After Mr. Busse testified about the issues he found at the project, Richard Haines, the CEO of RLH Construction, Inc., testified that his "all in" bid to correct the issues at the project was $9,157,690.

Arthur Newcomb, Appellant's construction supervisor for the project, testified that he was given 210 days to complete each building. He affirmatively responded when asked if he "beat that time." When asked if his average for each building was 135 days, he replied, "Well, some were in the lower, some were less, yes."

After Appellee rested its case, Appellant's counsel moved for a directed verdict in part on the grounds at issue in this appeal. The trial court denied the motion.

During Appellant's case, Mr. Newcomb again testified. When asked on cross-examination whether he paid attention to how various aspects of the construction were being done, he replied, "Not every minute, but when I was – if I was walking behind a building, I would try to observe everything I could." When asked whether he could really put his eyes on every building, he replied, "It would be impossible to be everywhere at one time." He testified

that the way in which a photograph showed styrofoam being used on the "lath" of a wall was "not the way it's supposed to be done." When asked about photographs showing some unit roofs, Newcomb testified, "It should not be holding water there." When shown photographs of the stucco at issue, Newcomb testified, "I agree, it doesn't look well, but it doesn't necessarily mean the water is going to get to the actual structure of the building." When asked if he would have had voids in the stucco redone, Newcomb replied, "Yes." He testified, "If I would have seen that, I would have definitely made that correction there." When asked if he ever complained to Appellant that he was being handicapped, Newcomb replied, "I requested more information about certain things, yes." When asked if that was not well-received, he replied, "Depending on the circumstance." He later testified, "Not everything that I needed, that I felt like I needed, to do the job. They gave me what they felt like I needed to get the job done."

The jury found that Appellant was negligent and that its negligence was the legal cause of Appellee's loss or damage. As for the building code violation claim, the jury found that Appellee was damaged by "any violation" of the code and that Appellant knew or should have known that the violations existed. With regard to the breach of statutory warranty claim, the jury found that Appellant breached the implied warranty of fitness and merchantability, which was the legal cause of loss or damage to Appellee. The jury found that the total amount of damages sustained by Appellee was $9,600,000. The jury checked "yes" when asked if "any portion of the total amount awarded [was] due to installation of the stucco."

Appellant subsequently filed a motion for new trial or, in the alternative, motion for remittitur. In denying the motion in part, the trial court found that Appellee presented evidence of excessive stucco cracking. The trial court granted Appellant's motion to set aside the verdict as to the negligence claim based on the economic loss rule. It subsequently entered a final judgment in Appellee's favor. This appeal followed.

ANALYSIS

Appellant first contends that it is entitled to have the verdict set aside or have the case remanded for a new trial because the

6

trial court erroneously admitted extrapolation evidence from Mr. Woods and Mr. Busse. The trial court assessed this evidentiary issue below pursuant to section 90.702, Florida Statutes. In amending the statute in 2013, the Legislature sought to adopt the evidentiary standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and cease the application of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). While this appeal was pending, the Florida Supreme Court issued *DeLisle v. Crane Co.*, No. SC16-2182, 2018 WL 5075302, at *1 (Fla. Oct. 15, 2018). There, the supreme court recognized that while both *Frye* and *Daubert* purport to provide a trial judge with the tools necessary to ensure that only reliable evidence is presented to the jury, *Frye* relies on the scientific community to determine reliability whereas *Daubert* relies on the scientific savvy of trial judges to determine the significance of the methodology used. *Id.* at *8. In finding the Legislature's adoption of the *Daubert* test unconstitutional, the supreme court reaffirmed that *Frye* is the appropriate test in Florida courts. *Id.* It noted its prior recognition that *Frye* is inapplicable to the vast majority of cases because it applies only when experts render an opinion that is based upon new or novel scientific principles. *Id.* Notwithstanding that the trial court and the Fourth District analyzed the admission of expert testimony in the case under section 90.702 and *Daubert*, the supreme court held that because medical causation testimony was not new or novel and was not subject to a *Frye* analysis, the testimony at issue was properly admitted by the trial court and should not have been excluded by the Fourth District. *Id.*

Given the supreme court's *DeLisle* opinion, we directed each party to file a response addressing how the opinion affected our consideration of Appellant's first issue on appeal. Appellee claims that Appellant's arguments as to this issue are now moot "because under a '*Frye* analysis' no judicial review of [its] expert testimony was even necessary, since the uncontroverted evidence was that the opinion testimony by [its] expert engineers was based on established peer-reviewed scientific standards and was not 'new or novel.'" Appellee also contends that there is "no reason or need for any remand or reconsideration of the sufficiency of the expert testimony under a *Frye* analysis." In contrast, Appellant argues that applying the *Frye* standard to Appellee's expert opinions

7

requires reversal because the experts offered opinions that were based on new and novel scientific principles or discovery.

The supreme court has described the *Frye* test as one in which the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the results are scientifically reliable as accurate. *Bundy v. State*, 471 So. 2d 9, 13 (Fla. 1985). Stated differently, under *Frye*, the proponent of the evidence has the burden of establishing by a preponderance of the evidence the general acceptance of the underlying scientific principles and methodology. *Marsh v. Valyou*, 977 So. 2d 543, 547 (Fla. 2007). However, as stated, the *Frye* standard only applies when an expert attempts to render an opinion that is based upon new or novel scientific techniques. *Id.*

We accept Appellee's argument that no *Frye* analysis is necessary in this case. In reaching our decision, we find it important that the trial court, albeit in the context of its *Daubert* analysis, found that Appellee's experts used a scientifically reliable and peer-reviewed methodology that was the industry standard. That finding was supported not only by Appellee's expert testimony but also by the affidavit of Tom Miller, a professional engineer who was asked to review the methodology employed by the experts. Miller explained in detail the methods and techniques that should be employed in the forensic investigation of wood frame stucco clad buildings by competent professional engineers. He also listed the techniques that are applied by the community of professional engineers in Florida in evaluating buildings similar to Heron's Landing. Miller stated, "Based on my review of the documents described above, [Appellee's experts] used the above methodologies in [their] forensic investigation of Heron's Landing in order to reach the opinions . . . ." He opined that the techniques used by Woods were techniques that are generally accepted in the community of Florida and national professional engineers when investigating building conditions at projects similar to Heron's Landing and were consistent with the intent of the peer-reviewed techniques published by the ASTM. He also opined that the methodology used was sufficiently reliable and had widespread acceptance within the relevant scientific community. As such, Appellant's argument that

Appellee's experts' opinions were based upon new or novel scientific methods or techniques and that a *Frye* analysis is necessary is without merit. Appellant has shown no error on the trial court's part in admitting the evidence at issue.

In its second issue, Appellant argues that the trial court erred in failing to grant its motion for a directed verdict. An order on a motion for directed verdict is reviewed de novo. *Kopel v. Kopel*, 229 So. 3d 812, 819 (Fla. 2017). The denial of such a motion must be affirmed "if any reasonable view of the evidence could sustain a verdict in favor of the non-moving party." *Id.* All evidence and inferences of fact must be viewed in the light most favorable to the nonmoving party. *Id.*; *see also Coba v. Tricam Indus., Inc.*, 164 So. 3d 637, 646 (Fla. 2015) (noting that a motion for directed verdict should be granted only if no view of the evidence could support a verdict for the nonmoving party and the trial court determines that no reasonable jury could render a verdict for the party).

Appellant claims that no actual damages were sustained by Appellee as a result of building code violations. Section 553.84, Florida Statutes (2013), provides:

> Notwithstanding any other remedies available, any person or party, in an individual capacity or on behalf of a class of persons or parties, damaged as a result of a violation of this part or the Florida Building Code, has a cause of action in any court of competent jurisdiction against the person or party who committed the violation; however, if the person or party obtains the required building permits and any local government or public agency with authority to enforce the Florida Building Code approves the plans, if the construction project passes all required inspections under the code, and if there is no personal injury or damage to property other than the property that is the subject of the permits, plans, and inspections, this section does not apply unless the person or party knew or should have known that the violation existed.

As Appellant points out, none of the cases that have cited this statute, which was enacted in 1974, have held that a claim under

the statute can succeed without proving actual damages. The Fifth District has described section 553.84 as providing a "cause of action where a defendant has injured a plaintiff by violating the building code or doing construction without the required permit." *Stallings v. Kennedy Elec., Inc.*, 710 So. 2d 195, 195 (Fla. 5th DCA 1998). The Second District has described section 553.84 as "a remedial statute because it provides relief for a person whose home has been built in violation of the building code . . . ." *Anderson v. Taylor Morrison of Fla., Inc.*, 223 So. 3d 1088, 1089 (Fla. 2d DCA 2017).

Other cases, while not addressing the specific issue raised in this appeal, show that homeowners have brought claims under the statute for defects similar to the ones alleged in this case. For instance, in *Edward J. Seibert, A.I.A, Architect & Planner, P.A. v. Bayport Beach & Tennis Club Ass'n*, 573 So. 2d 889, 890 (Fla. 2d DCA 1990), the appellants challenged a final judgment entered against them and in favor of the appellee. The Second District explained that the appellee was a condominium development; the appellant was the architect. *Id.* In its lawsuit against the appellant and others, the appellee claimed that the appellant was responsible for damages because of defective roofing design and construction, defective fire exit design, defective stucco design and construction, and defective ceiling slab design. *Id.* at 890-91. In *Anderson*, the issue was the interpretation of an arbitration provision. 223 So. 3d at 1089. However, it was noted that the appellants, who entered into a sales agreement with the appellee builder to purchase a home, filed a complaint against the appellee alleging in part a violation of the Florida Building Code by inadequately and improperly installing the stucco system on their home. *Id.* They claimed the code violations were latent and not readily observable or known to them until damages began to manifest themselves in the form of cracking to the exterior stucco years after construction ended. *Id.* The Second District reversed the order compelling arbitration and remanded the matter to the trial court for further proceedings "on the . . . complaint." *Id.*

In support of its argument, Appellant relies in part upon *Eagle-Picher Industries, Inc. v. Cox*, 481 So. 2d 517 (Fla. 3d DCA 1985). There, the Third District, in addressing cancer-related asbestosis, held that damages were not recoverable for the future

risk of cancer. *Id.* at 526. This case presents a different issue than someone's exposure to a dangerous substance and possible future illness as a result. Here, numerous homeowners testified to issues they were having in their homes. Moreover, Appellee presented expert testimony regarding defects in the units – defects that, according to the experts, needed to be remedied to avoid additional loss and damage. Appellant's own project supervisor acknowledged several defects and testified that had he seen or known about them, he would have had them remedied prior to the completion of the project. Therefore, we reject Appellant's argument that Appellee failed to present evidence of actual damages.

Within its second issue, Appellant also asserts that Appellee did not present evidence that it knew or should have known of building code violations under section 553.84. We reject this argument as well. As stated, Appellant's project supervisor acknowledged at trial that various problems existed at Heron's Landing. When asked if he ever complained to Appellant that he was being handicapped, he replied, "I requested more information about certain things, yes." He also testified, "Not everything that I needed, that I felt like I needed, to do the job. They gave me what they felt like I needed to get the job done." Thus, the jury was presented with evidence that Appellant either knew or should have known about the issues at Heron's Landing.

Appellant also asserts that Appellee did not establish a breach of the implied warranty of habitability. As Appellant notes, section 718.203(1), Florida Statutes (2013), provides that a "developer shall be deemed to have granted to the purchaser of each [condominium] unit an implied warranty of fitness and merchantability for the purposes or uses intended." "The contractor and all subcontractors and suppliers, grant to the developer and to the purchaser of each unit implied warranties of fitness as to the work performed or materials supplied by them." § 718.203(2), Fla. Stat. (2013). As the supreme court has explained, "The general test for whether a party has breached the implied warranties of fitness and merchantability [for a new home] 'is whether the premises meet ordinary, normal standards reasonably to be expected of living quarters of comparable kind and quality.'" *Maronda Homes, Inc. of Fla. v. Lakeview Reserve Homeowners*

11

*Ass'n*, 127 So. 3d 1258, 1268 (Fla. 2013) (citation omitted). In other words, a warranty is breached "if the residence is rendered not reasonably fit for the ordinary or general purpose intended." *Id.*; *see also Schmeck v. Sea Oats Condo. Ass'n*, 441 So. 2d 1092, 1097 (Fla. 5th DCA 1983) ("It is now well established that a developer may be held liable for damages for breach of implied warranties in failure to construct according to plans or in a workmanlike or acceptable manner, or for failure to provide a unit or building which is reasonably habitable.").

According to Appellant, because none of the unit owners or the experts testified that there was an inability to inhabit the units, the use for which they were intended, the trial court should have granted a directed verdict as to the implied warranty claim. Thus, Appellant takes the position that in order to breach the implied warranty set forth in section 718.203, a condominium unit must be uninhabitable. However, nothing Appellant cites supports this position. As we stated, numerous homeowners testified about various problems they were experiencing with their condominium units. Although the defects did not force the homeowners to abandon their homes, the testimony certainly supported the jury's determination that the units did not meet the ordinary, normal standards that were reasonably to be expected of living quarters of comparable kind and quality. Thus, the trial court did not err in denying Appellant's motion for directed verdict on this ground.

CONCLUSION

For the reasons expressed herein, we find no error in the trial court's admission of Appellee's expert testimony or in its denial of Appellant's motion for a directed verdict. Accordingly, we affirm the final judgment.

AFFIRMED.

WETHERELL and WINOKUR, JJ., concur.

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____


Kimberly A. Ashby of Foley & Lardner LLP, Orlando; Ian P. Gillan and Justin M. Leise of Koeller, Nebeker, Carlson & Haluck, LLP, Orlando, for Appellant.

Michael J. Korn of Korn & Zehmer, P.A., Jacksonville; Barry B. Ansbacher of Ansbacher Law, Jacksonville, for Appellee.